1

2

3

4

5

6

7

8

9                    UNITED STATES DISTRICT COURT

10                   EASTERN DISTRICT OF CALIFORNIA

11                        ----oo0oo----

12

13  SCOTT SHEWBRIDGE,
                                    NO. CIV. S-05-0740 FCD EFB
14          Plaintiff,

15     v.                           MEMORANDUM AND ORDER

16  EL DORADO IRRIGATION DISTRICT,
    a municipal corporation; ANE
17  DEISTER, DAVID POWELL, THOMAS
    CUMPSTON, GEORGE WHEELDON, and
18  GEORGE OSBORNE,

19          Defendants.

20                        ----oo0oo----

21      This matter is before the court on a motion for summary

22  judgment, or alternatively, partial summary judgment brought by

23  defendants El Dorado Irrigation District ("EID"), Ane Deister

24  ("Deister"), David Powell ("Powell"), Thomas Cumpston

25  ("Cumpston"), George Wheeldon ("Wheeldon") and George Osborne

26  ("Osborne") (sometimes collectively, "defendants").[1]  By the

27

28  _____
          [1]    Because oral argument will not be of material
    assistance, the court orders this matter submitted on the briefs.
    E.D. Cal. L.R. 78-230(h).

motion, defendants seek adjudication in their favor on plaintiff Scott Shewbridge's ("plaintiff") complaint, alleging claims for (1) violation of 42 U.S.C. § 1983 on the grounds defendants retaliated against plaintiff for exercising his First Amendment rights and terminated him without sufficient due process and (2) conspiracy to violate plaintiff's civil rights.[2]  Plaintiff opposes the motion, arguing that triable issues of fact exist as to each of his claims.

For the reasons set forth below, the court GRANTS in part and DENIES in part defendants' motion.

**BACKGROUND**

In November 2001, EID hired plaintiff as a Senior Engineer for the Water Division. (Pl.'s Resp. to Defs.' Stmt. of Undisputed Facts ["UF"], filed Nov. 17, 2006 [Docket #36-3], ¶s 1, 2.)  At the time, and during all times relevant to this action, plaintiff resided in El Dorado County, within EID's district.  (Pl.'s Stmt. of Add'l Material Facts ["AF"], filed Nov. 17, 2006 [Docket #36-3], ¶ 1.)  Subsequently, plaintiff became the co-head of the Hydro Division. (UF ¶ 3.)  Throughout his employment with EID, plaintiff's primary task was to lead the re-licensing of Project 184, which involved large scale water diversions, conveyances, and hydroelectric facilities. Plaintiff's job duties connected with this project included review of documentation from past interactions, including

---

[2]    In his complaint, filed April 15, 2005, plaintiff also alleged a claim for wrongful termination in violation of public policy under state law.  Said claim, however, was dismissed on defendants' motion under Federal Rule of Civil Procedure 12(b)(6).  (Mem. & Order, filed Sept. 22, 2005 [dismissing claim as untimely under the California Tort Claims Act].)

2

litigation, notices of violation, interactions with regulatory agencies, and studies done in support of the re-licensing efforts.  (UF ¶ 5.)  Plaintiff's duties also involved meeting with the re-licensing group members, including state, federal and local resource agencies, regulators, and nongovernmental organizations, managing the hydrologic data and reviewing the results from hydrologic modeling for EID's raw water supply.  (UF ¶s 6-7.)  Throughout his employment, plaintiff believed he had a personal and ethical obligation as a professional engineer to report wrongdoing by the district and any potential danger to the public.  (UF ¶ 8.)

Defendant Powell supervised plaintiff during his employment with EID.  (UF ¶ 9.)  Powell's duties as plaintiff's supervisor included preparing written performance evaluations and discussing those evaluations with plaintiff.  (UF ¶ 10.)  On July 21, 2002, Powell prepared a performance evaluation for plaintiff, indicating: "You can and do come on too strong at times however, and this intimidates your employees and peers.  You should tone this down a bit when appropriate."  (UF ¶ 11-12.)  Powell discussed the contents of the evaluation with plaintiff.  (UF ¶ 13.)  On August 14, 2002, plaintiff signed the evaluation and indicated he understood Powell wanted him to change his style of communication.  (UF ¶ 14.)

Thereafter, in September 2002, defendants assert plaintiff again began behaving inappropriately.  (UF ¶ 60.)  On September 26, 2002, plaintiff walked out of a staff meeting in frustration over comments made by defendant Deister, General Manager of EID. (UF ¶s 61, 75.)  On September 30, 2002, defendants claim

3

plaintiff engaged in "attack style interactions" in a meeting with Board members and other staff. (UF ¶ 62.) Then, on October 10, 2002, defendants assert plaintiff became agitated in a meeting with Deister and was accusatory and disrepectful towards her. (UF ¶ 63.) Plaintiff disputes defendants' characterizations of these incidents and asserts he acted appropriately under the circumstances of each incident. (UF ¶s 60, 62, 63.)

On November 15, 2002, Powell prepared another performance evaluation for plaintiff, which he discussed with plaintiff. (UF ¶s 20, 21.) At the time of this evaluation, plaintiff was still on an initial 12-month probationary period. (UF ¶ 22.) Based on the recent incidents, plaintiff's performance was deemed unacceptable in this evaluation, and defendants assert plaintiff's probationary period was extended.[3] (UF ¶ 23.) Plaintiff contends his probationary period was not extended. (UF ¶ 23; AF ¶ 19.)

Also on November 15, 2002, Powell prepared and issued a Performance Improvement Plan ("PIP") to plaintiff. (UF ¶ 24.) Defendants assert the plan was intended to help plaintiff improve his behavior and give him an opportunity to change his manner of

---

[3]     Section 6 of EID's Personnel Policy Statement distinguishes between regular (permanent) employees and probationary employees. (UF ¶ 15.) A regular employee is an employee who was hired, has received a satisfactory evaluation of performance and has 12 months, or more, continuous employment with the district in an established position. (UF ¶ 16.) Upon completion of 12 months of continuous service with the district and upon receiving a satisfactory evaluation of performance, a probationary employee will be granted regular status. (UF ¶ 17.) Permanent employees have the right to appeal demotions and dismissals, but probationary employees do not. (UF ¶s 18, 19.)

4

dealing with EID personnel, including his supervisors.  (UF ¶ 25.)  Plaintiff disputes that the PIP was warranted, in the first instance, and asserts it was never formally initiated.  (UF ¶s 25, 26.)  According to plaintiff, on November 22, 2002, Deister told him the PIP "would not be issued, that there were mistakes in it, that it contained materials in it that had come from Mary Egan that were wrong and it was not going to be issued."  (UF ¶ 26; AF ¶ 20.)

On February 27, 2003, plaintiff met with Deister about changes that were made to the EID Organizational Chart.  (UF ¶ 27.)  Defendants assert that during this meeting, plaintiff closed the door to Deister's office and argued with her in a loud voice, yelling and exhibiting aggressive behavior.  (UF ¶ 28.)  Three people overheard the incident.  (UF ¶ 29.)  Plaintiff disputes that he yelled or exhibited aggressive behavior towards Deister and maintains that he acted appropriately under the circumstances of two people having a disagreement.  (UF ¶ 28.)

The following week, on March 3 or 4, 2003, plaintiff received a "Notice of Two Day Suspension for Insubordination," authored and delivered by Powell.  The Notice cited several incidents of alleged misconduct and insubordination by plaintiff, from September 2002 to February 2003, and notified plaintiff that any further acts of insubordination would result in termination. (UF ¶s 31, 32.)

/////

/////

/////

/////

5

In April 2003, Powell decided to terminate plaintiff and began preparing a "Notice of Intent to Terminate." (UF ¶ 40.)[4] Also in April 2003, then Boardmember, Al Vargas, overheard a meeting between Deister, Cumpston,[5] Powell, Wheeldon and Osborne,[6] at which they discussed terminating plaintiff, and Vargas told plaintiff defendants intended to terminate him. (UF ¶ 56.)

In July 2003, plaintiff was given a "<u>Skelly</u>"[7] hearing to contest his 2-day suspension and was allowed to have counsel present. (UF ¶s 33.) At the hearing, plaintiff raised questions about Deister's behavior. (UF ¶ 34.) The <u>Skelly</u> officer upheld the suspension, and plaintiff appealed the decision to the Board of Directors, who also upheld the suspension. (UF ¶s 35, 36.) During this appeal, plaintiff again raised questions about the management style, ethics and legality of certain decisions taken by Deister. (UF ¶ 38.)

///

---

[4]   Plaintiff's foundational objection to this evidence is overruled. Defendant Powell filed a declaration attesting to this fact, and moreover, *plaintiff* alleged this fact in his complaint and testified that he based the allegation on a draft version of the Notice of Intent to Terminate found in the Department of Labor files.

[5]   Defendant Cumpston is EID's General Counsel. (UF ¶ 77.)

[6]   Defendants Wheeldon and Osborne are members of EID's Board of Directors. (UF ¶ 78.)

[7]   <u>Skelly v. State Personnel Bd.</u>, 15 Cal.3d 194 (1975) (finding that state statutory scheme regulating civil service employment confers on a permanent civil service employee a property interest in continuation of his employment and that this interest is protected by due process)

Thereafter, on August 8, 2003, plaintiff was given a Notice of Intent to Terminate prepared by Powell. (UF ¶ 39.) Said Notice set forth the factual basis for the termination noting multiple instances whereby defendants claimed plaintiff was insubordinate to his supervisor, Powell, and the General Manager, Deister, and was verbally abusive to others within EID. (UF ¶ 64.) Plaintiff was given an opportunity to respond via another Skelly hearing, and he again had counsel present. (UF ¶ 41, 43.) Steve Cascioppo, Executive Officer of El Dorado County courts, served as hearing officer. (UF ¶ 42.) Mr. Cascioppo affirmed the termination, and plaintiff appealed to the Board of Directors on March 19, 2004. (UF ¶ 44.) The Board also affirmed plaintiff's termination. (UF ¶ 45.)

Plaintiff claims that the negative performance reviews, suspension and eventual termination were all a pretext to silence him in retaliation for reporting wrongdoing by EID management. (UF ¶ 46.) Plaintiff also claims he did not receive fair Skelly hearings in that the judges were not impartial, and he was not allowed to present his side of the story. (AF ¶ 22, 24.)

Both as an EID employee and as a resident of El Dorado County, plaintiff asserts he had a direct interest in issues of water quality, water availability, water delivery and the effect of EID's management of water resources on the environment in which he lived. (AF ¶ 1.) Once employed by EID, plaintiff states he began to question EID management on these issues, often in the face of severe rebukes. (AF ¶ 2; UF ¶ 70.) Yet, plaintiff continued to advocate his position that EID was mismanaging El Dorado County's water resources in ways which

7

1    could lead to environmental damage, water shortages, and the

2    complete unavailability of water for consumption and fire

3    suppression in El Dorado Hills.  (AF ¶ 3.)

4         Specifically, either prior to his actual termination in

5    August 2003 and/or prior to his receiving notice, in

6    approximately April 2003, of defendants' intent to terminate him,

7    plaintiff:

8        (1)  complained to Deister and Powell about Deister's
             hostile treatment of other employees (AF ¶ 6);
9

10       (2)  expressed concern about improper participation, in
             violation of the Brown Act, by three Board members,
11           including Wheeldon and Osborne, in a participation
             meeting regarding access to the Crawford Ditch (UF
12           ¶ 50);

13       (3)  complained about Powell's misrepresentation at a pre-
             Board meeting and Board meeting regarding the amount of
14           losses of water flowing through Crawford Ditch (AF
             ¶ 4);

15       (4)  complained to Deister about her withholding of
             information from the Board in November 2002 through
16           January 2003 (AF ¶s 6, 18; UF ¶ 52);

17       (5)  in May 2003, made complaints to the Department of Fish
             and Game, the State Water Board, the Department of
18           Health Services and the California Attorney General's
             office about EID's misrepresentations and misreporting
19           of water supply by EID and about insufficient supply to
             meet demand in El Dorado Hills (AF ¶s 12, 13; UF
20           ¶ 47 );

21       (6)  In May 2003, participated in a public water conference,
             as a private citizen, over the objections of Cumpston,
22           who threatened plaintiff with loss of his job if he
             participated, and Deister (AF ¶ 10, 11);
23
         (7)  participated in a presentation regarding water supply,
24           demand and diversion issues to citizens of El Dorado
             County through the Maidu Group of the Sierra Club (AF
25           ¶ 14);

26       (8)  participated at Board meetings following his being
             placed on administrative leave, to voice concerns
27           regarding issues of water supply and demand (AF ¶ 15);

28

                                    8

(9)  wrote letters to the editor and had discussions with reporters regarding his concerns about water supply and demand issues (AF ¶ 16); and

(10) participated in the EID Citizen's Water Advisory Group (AF ¶ 17).

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998).  The evidence must be viewed in the light most favorable to the nonmoving party. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp., 477 U.S. at 325.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in

light of the evidentiary burden the law places on that party.

See <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216, 1221 (9th

Cir. 1995).  The nonmoving party cannot simply rest on its

allegations without any significant probative evidence tending to

support the complaint.  <u>See</u> <u>Nissan Fire & Marine</u>, 210 F.3d at

1107.  Instead, through admissible evidence the nonmoving party

"must set forth specific facts showing that there is a genuine

issue for trial."  Fed. R. Civ. P. 56(e).

**ANALYSIS**

**1.   § 1983 Claim[8] – Retaliation in Violation of First
Amendment Free Speech Rights**

Defendants move for summary judgment as to plaintiff's

retaliation claim arguing plaintiff cannot demonstrate he engaged

in speech protected by the First Amendment and even if he could,

plaintiff cannot demonstrate that his speech was a substantial or

motivating factor in defendants' decision to terminate him.  To

establish a claim for retaliation in violation of free speech

rights, a public employee plaintiff must demonstrate: (1) he

engaged in constitutionally protected speech; (2) the employer

took adverse employment action against the employee; and (3) the

employee's speech was a "substantial or motivating" factor in the

adverse action.  <u>Freitag v. Ayers</u>, 468 F.3d 528, 543 (9th Cir.

---

[8]     Section 1983 does not create any substantive rights but
rather provides a vehicle whereby a plaintiff can challenge
actions by governmental officials.  To establish a violation of
§ 1983, a plaintiff must demonstrate that (1) the action occurred
under color of state law and (2) the action resulted in the
deprivation of a constitutional right or federal statutory right.
<u>Jones v. Williams</u>, 297 F.3d 930, 934 (9th Cir. 2002) (internal
quotations and citations omitted).  Here, it is undisputed that
defendants acted under "color of state law."  The only issue then
is whether defendants violated plaintiff's constitutional rights,
namely, his First Amendment and/or due process rights.

2006).  The first and third elements are at issue on this motion as the parties do not dispute that defendants' took adverse employment action against plaintiff when they terminated him.

As to the first issue, whether plaintiff engaged in protected speech, the court must engage in a three-step analysis: First, the court must determine whether plaintiff spoke as a citizen or an employee.  Garcetti v. Ceballos, 126 S.Ct. 1951 (2006).  Second, the court must determine whether, in light of the content, form and context of the speech, it touched on matters of public concern.  Connick v. Meyers, 461 U.S. 138, 146 (1983).  Third, the court must determine whether the value of the employee's speech outweighs "the government's interest in the effective and efficient fulfillment of its responsibilities to the public."  Id. at 150.  Ordinarily, these are questions of law for the court to decide.  Id. at 148 n. 7.  However, as set forth below, there are certain factual issues in this case that must be addressed by a jury first which preclude this court from making a conclusive determination herein.  Accord Kodrea v. City of Kokomo, 2006 WL 1750071 (S.D. Ind. June 22, 2006).

Defendants contend that plaintiff's speech was not made in his capacity as a citizen but in the context of his employment. The Supreme Court, in Garcetti v. Ceballos, 126 S.Ct. 1951 (2006), recently addressed the issue of whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties.  The plaintiff, Ceballos, was a deputy district attorney employed as a calendar deputy with supervisory responsibilities.  Id. at 1955. Pursuant to his duties, he investigated a complaint from a

11

defense attorney regarding inaccuracies in an affidavit used to obtain a search warrant.  Id. at 1955-56.  Following his investigation, Ceballos prepared a memo outlining his concerns with the affidavit and recommending that the case be dismissed.  Id. Ceballos' memo prompted a meeting with his supervisors and members of the sheriff's department that allegedly became very heated.  Id. at 1956.  In spite of Ceballos' concerns, the district attorney's office decided to proceed with the prosecution.  Id.  Thereafter, during a hearing on a motion challenging the warrant, Ceballos was called by the defense to testify about his observations, but the trial court upheld the warrant.  Id. Ceballos claimed that he was subsequently subjected to retaliation, including a transfer and denial of a promotion.  Id.

     The Court found that the controlling factor in determining whether Ceballos' speech was protected was that his expressions were made pursuant to his official duties as a calendar deputy.  Id. at 1960.  Part of Ceballos' responsibilities were to investigate concerns and advise his supervisors regarding pending cases, a fact that was not disputed by the parties.  Id.  Under these circumstances, the Supreme Court concluded "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Id.

     In reaching this decision, the Court made several observations applicable to this case.  First, because the parties did not dispute that Ceballos wrote the memo pursuant to his

employment duties, the Court observed that it did not have

occasion to articulate a framework for defining the scope of an

employee's duties in cases where there is room for serious

debate.  Id. at 1961.  It did reject, however, the suggestion

that an employer can restrict an employee's rights simply by

creating broad job descriptions.  Id.[9]  In addition, the Court

was not persuaded that Ceballos' speech was unprotected merely

because he had expressed his views in the office and they

concerned the subject matter of his employment, explicitly noting

that in some cases employees may still receive First Amendment

protection for expressions made at work or related to the

employee's job.  Id. at 1959.

Ceballos thus reveals that the "critical inquiry" in

addressing whether plaintiff's speech in this case was protected

is plaintiff's job responsibilities (i.e., was his speech made

"pursuant to [his] official duties").  Freitag v. Ayers, 468 F.3d

528, 545 (9th Cir. 2006).  However, here, unlike the situation in

Ceballos, there is a factual dispute concerning whether

plaintiff's speech was made pursuant to his ordinary job duties.

See accord Kodrea v. City of Kokomo, 2006 WL 1750071 (S.D. Ind.

June 22, 2006).  Defendants proffer no evidence that it was

plaintiff's job as a engineer for EID to report wrongdoing by the

district, either internally (within the district) or externally

---

[9]     The Court stated: "The proper inquiry is a practical
one.  Formal job descriptions often bear little resemblance to
the duties an employee actually is expected to perform and the
listing of a given task in an employee's written job description
is neither necessary nor sufficient to demonstrate that
conducting the task is within the scope of the employee's
professional duties for First Amendment purposes."  Id. at 1961-
62.

1   (to outside agencies).  Instead, defendants rely on plaintiff's

2   testimony at his deposition that he believed, as a professional

3   engineer, he had an obligation to report wrongdoing by the

4   district and to respond to what he perceived as potential dangers

5   to the public; defendants maintain plaintiff's "obligation as a

6   professional engineer is inseparable from his obligation as an

7   employee of EID because he was hired by EID to work *as an*

8   *engineer*."  (Mem. of P&A, filed Aug. 29, 2006, 10:17-19)

9   (emphasis in original.)  Defendants' argument is not persuasive.

10  They mischaracterize plaintiff's testimony.  Plaintiff did not

11  testify that such reporting was within his *job* duties for EID;

12  rather, he testified that by law, under the California Code of

13  Regulations governing engineers, he believed he had a

14  professional and ethical obligation to report wrongdoing by the

15  district and to respond to any perceived danger to the public.

16  (UF ¶ 8 [Pl.'s Dep. at 32:11-33:24].)  As set forth in his

17  opposition to the motion, plaintiff clearly disputes that his

18  speech in this case fell within any specific job duties he had

19  for EID.  (Id.; AF ¶ 1.)

20      What his job duties included is the "critical inquiry."

21  Freitag, 468 F.3d at 545 (emphasizing the distinction between

22  speech *attendant to* a public employee's official duties and

23  speech *about* the subject of a public employee's employment and

24  holding that only the former is not protected speech under

25  Ceballos); see also accord Wilcoxon v. Red Clay Consolidated Sch.

26  Dist. Bd. of Educ., 437 F. Supp. 2d 235 (D. Del. 2006); Kodrea v.

27  City of Kokomo, 2006 WL 1750071 (S.D. Ind. June 22, 2006).

28  Accordingly, because there are factual issues about whether

14

plaintiff's job responsibilities included the obligation to report wrongdoing by the district either internally to his supervisors or externally to other agencies, the court is unable to conclude that plaintiff's complaints were made simply as an employee in performance of his duties rather than a concerned citizen. The court, therefore, must resolve any doubt in favor of plaintiff for purposes of summary judgment and conclude, at this stage of the proceedings, that plaintiff may have acted as a concerned citizen. Defendants thus are not entitled to summary judgment on this issue.

As to the next inquiry, whether plaintiff's speech addressed a matter of public concern, the court finds that it is able to make, on the record presented, this legal determination.

A public employee addresses a matter of public concern when his speech relates to an issue of "political, social, or other concern to the community." Connick, 461 U.S. at 146. "Speech that concerns issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection." Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003). In contrast, "speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies, is generally not of public concern." Id.

In defining the scope of First Amendment protection afforded to public employees' speech, the Supreme Court has distinguished between speech "as a citizen upon matters of public concern" at

15

one end and speech "as an employee upon matters only of personal interest" on the other.  <u>Connick</u>, 461 U.S. at 147.  Thus, the relevant inquiry under <u>Connick</u> is the point of the speech in question--was it the employee's point to bring wrongdoing to light or was the point to further some purely private interest?  <u>Roth v. Veteran's Admin. of United States</u>, 856 F.2d 1401, 1406 (9th Cir. 1988).  It is only when it is clear that the information would be of no relevance to the public's evaluation of the performance of governmental agencies, that the public employee's speech receives no protection.  <u>Ulrich v. City & County of San Francisco</u>, 308 F.3d 968, 978 (9th Cir. 2002).

The vast majority of plaintiff's speech in this case falls squarely within the confines of speech addressing matters of public concern.  (AF ¶s 4, 10-18; UF ¶s 47, 50, 52.)  With the exception of his internal complaints about his supervisors' treatment of employees (AF ¶ 6), his speech addressed issues concerning EID's alleged misrepresentations to the public concerning water supply and demand within the district and EID's mismanagement of the district.  As such, his speech sought to bring alleged wrongdoing to light, and it addressed topics which would be important to the public in evaluating the performance of EID.  <u>Coszalter</u>, 320 F.3d at 973; <u>Roth</u>, 856 F.2d at 1406.  The court, therefore, finds that said speech was of a matter of public concern.

However, even if speech relates to a matter of public concern, it is not constitutionally protected unless the speaker's First Amendment interests outweigh the public employer's interests "in promoting workplace efficiency and

1  avoiding workplace disruption." Ceballos v. Garcetti, 361 F.3d

2  1168, 1173 (9th Cir. 2004), *overruled on other grounds*, 126 S.Ct.

3  1951 (2006).  "The employer bears the burden of proving that the

4  balance of interests weighs in its favor." Id.  Defendants have

5  not met this burden.  They have not presented any evidence with

6  regard to the Connick-Pickering balance test.  (Mem. of P&A at

7  11:4-12 [*Attorney* argument that plaintiff's speech impacted EID's

8  ability to complete the re-licensing project is not evidence the

9  court can consider.].)  There is nothing in the record to suggest

10 that plaintiff's speech was sufficiently disruptive so that the

11 government's interest in promoting efficiency outweighed

12 plaintiff's First Amendment rights.  Moreover, the Supreme Court

13 has recognized that speech which "seek[s] to bring to light

14 actual or potential wrongdoing or breach of the public trust" is

15 entitled to heightened protection, even in the face of alleged

16 disruption to the employer. Connick, 461 U.S. at 148.

17 Accordingly, and assuming without deciding that plaintiff spoke

18 as a citizen, the court must conclude at this stage, that

19 plaintiff's speech is protected.  Defendants are therefore not

20 entitled to summary judgment on this issue.

21     Finally, the court must address whether retaliation for

22 plaintiff's exercise of his First Amendment rights was the

23 substantial or motivating factor in defendants' decision to

24 terminate plaintiff.  In "mixed motive" cases like this one,

25 where plaintiff alleges he was terminated for exercising his

26 First Amendment rights and defendants assert plaintiff was

27 terminated for insubordination and poor performance, the Ninth

28 Circuit has formulated a two-part burden shifting test. Gilbrook

17

1  v. City of Westminster, 177 F.3d 839, 854 (9th Cir. 1999).

2  First, plaintiff must show that his constitutionally protected

3  conduct was a substantial or motivating factor in defendants'

4  employment decision.   If plaintiff makes this showing, then the

5  burden shifts to defendants to show, by a preponderance of the

6  evidence, that they would have reached the same decision even in

7  the absence of plaintiff's protected conduct.   Id.  Plaintiff can

8  sustain his burden by introducing evidence regarding the

9  proximity in time between his speech and the allegedly

10  retaliatory action.   Coszalter, 320 F.3d at 977 (finding that

11  "depending on the circumstances, three to eight months is easily

12  within a time range that can support an inference of

13  retaliation").

14      Here, defendants contend plaintiff was terminated for

15  insubordination and poor performance.   However, plaintiff

16  presents sufficient evidence to place that rationale in dispute.

17  Contrary to defendants' characterization of the evidence,

18  plaintiff did not *first* begin to make complaints about EID

19  management only after he found out about defendants' intent to

20  terminate him from Vargas (in April 2003).   Plaintiff presents

21  evidence that from the inception of his employment with EID and

22  continuing throughout his employment up until his termination in

23  August 2003, he voiced complaints to EID management and outside

24  agencies that EID was mismanaging El Dorado County's water

25  resources in ways which could lead to environmental damage, water

26  shortages, and/or the complete unavailability of water for

27  consumption or fire suppression in El Dorado Hills.  (AF ¶s 2,

28  3.)  All of his complaints were made prior to his actual

18

termination in August 2003[10] (AF ¶s 4, 6, 10-18; UF ¶s 47, 50, 52), and they coincided with defendants' poor performance evaluations, suspension, and eventual termination of plaintiff. As the adverse action taken against plaintiff "took place on the heels of [his] protected activity," a jury may reasonably find that plaintiff's speech was a motivating factor in defendant's decision to terminate him.  <u>See e.g.</u> <u>Dey v. Colt Constr. & Dev. Co.</u>, 28 F.3d 1446, 1458 (7th Cir. 1994).

The court likewise finds based on this same evidence that plaintiff has raised a triable issue of fact that defendants' stated reasons for his termination are a mere pretext.  The court cannot find as a matter of law, on the record presented, that defendants would have reached the same decision even in the absence of plaintiff's speech about the district.  The underlying facts regarding plaintiff's alleged insubordination and poor performance are highly disputed.  It is for the jury to determine whether plaintiff acted appropriately in his dealings with EID management; should they find that he did, defendants' stated reasons for plaintiff's termination may well be unpersuasive in light of plaintiff's evidence concerning the temporal nexus between his complaints and defendants' adverse employment actions against him.

Accordingly, for the above reasons, defendants' motion for summary judgment as to plaintiff's retaliation claim for

---

[10]     Contrary to defendants' argument, the court finds that this is the critical date for purposes of analyzing plaintiff's retaliation claim.  While plaintiff may have learned of defendants' intent to terminate him in April 2003, it is undisputed that he was not *actually* terminated until August 8, 2003.

violation of plaintiff's First Amendment rights is denied.

**2.   § 1983 Claim – Violation of Procedural Due Process Rights**

Defendants move for summary judgment on plaintiff's procedural due process claim, arguing (1) as a probationary employee, plaintiff did not have a constitutionally-protected property interest in his employment, and thus, he was not entitled to any due process prior to his termination and (2) even if plaintiff were considered a permanent employee entitled to due process, he was afforded constitutionally adequate due process prior to his termination.   The parties agree that pursuant to EID's personnel policies, only "regular" or permanent employees are constitutionally entitled to procedural due process prior to their termination.[11]   Regents v. Roth, 408 U.S. 564, 577 (1972) (property interests are not created by the Constitution but rather are "created and their dimensions are defined by existing rules or understandings that stem from an independent source"). The parties dispute, however, whether plaintiff was a probationary or permanent employee at the time of his termination.  (AF ¶s 19, 20.)  Nevertheless, said dispute does not prevent a grant of summary judgment in favor of defendants because even assuming plaintiff was a *permanent* employee, he received adequate due process.

In this context of government employment, plaintiff was entitled, at a minimum, to pre-termination notice and an opportunity to respond in a hearing appropriate to the nature of the case.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532,

---

[11]   (UF ¶s 15-22.)

542 (1985).  The pretermination hearing, though necessary, need
not be elaborate.  Id. at 545.  Rather, "'[t]he formality and
procedural requisites for the hearing can vary, depending upon
the importance of the interests involved and the nature of the
subsequent proceedings.'"  Id. (citations omitted.)  "In general,
'something less' than a full evidentiary hearing is sufficient
prior to adverse administrative action."  Id. (citation omitted.)

Here, it is undisputed that plaintiff received both notice
and a hearing.  He received prior notice of his termination in
the "Notice of Intent to Terminate," and he was given an
opportunity to respond in a Skelly hearing and appeal before the
EID Board.  (UF ¶s 39, 41-45.)[12]

Plaintiff contends, nonetheless, that he has a viable due
process claim because the hearing officer was not impartial, and
he was not given the opportunity to present "his side of the
story."  (AF ¶s 22, 23.)  Other than his conclusory
allegations,[13] however, plaintiff has no evidence to support his
claims.  First, he has no factual basis for his assertion that

---

[12]  Plaintiff also, at times in his briefing, makes
reference to an alleged lack of due process relating to his 2-day
suspension.  However, plaintiff has not cited any law
demonstrating he is constitutionally entitled to any process
relating to such disciplinary action.  As such, the court
considers plaintiff's due process claim only with respect to his
termination.

[13]  In his deposition, plaintiff testified he believed the
due process procedures were inadequate because there was "no
segregation of management from judicial in the proceedings."  He
stated he believed the hearing officer was "behold(ed) to the
political powers in El Dorado County for his job" and that he
"underst[ood] from others that [Cascioppo] and [defendant]
Cumpston knew of each other when Mr. Cumpston worked at the – for
the El Dorado Water Agency and that they had a friendly
relationship."  This latter statement is clearly inadmissible
hearsay.

hearing officer, Cascioppo, was biased against him.  Indeed, the undisputed evidence is to the contrary.  Cascioppo was not employed by EID; he was the Executive Officer of El Dorado County courts.  (UF ¶ 42.)  Moreover, Cascioppo's decision was reviewed by the EID Board, and plaintiff likewise produces no evidence that the EID Board members were biased against him in reviewing his appeal.  (AF ¶ 22.)  Plaintiff cannot simply rest on his allegations without any significant probative evidence tending to support his complaint.  Nissan Fire & Marine, 210 F.3d at 1107. As plaintiff has no such evidence here, his due process claim on this basis must be dismissed.

Second, while plaintiff concedes he was given a hearing and appeal in order to respond to the notice of termination, he complains that he was not afforded adequate due process because at those proceedings he was not allowed to "present his side of the story."  Notably, plaintiff had counsel at both proceedings, and it is undisputed that he was permitted to speak and state his objections to the termination.  (UF ¶s 41-45.)  This is all that due process requires.  That *plaintiff* may have preferred to discuss his allegations of wrongdoing by EID instead of the allegations against himself does not raise a due process violation.  Plaintiff was constitutionally entitled to an *opportunity* to respond to the termination notice, and he received it.  Therefore, summary judgment in favor of defendants is also granted as to this basis for plaintiff's due process claim.

### 3.   Conspiracy to Violate § 1983

Defendants move to dismiss plaintiff's conspiracy claim, arguing that said claim is not cognizable under § 1983.  Citing

1  Cohen v. Norris, 300 F.2d 24 (9th Cir. 1962), defendants argue

2  the Ninth Circuit has only recognized such a claim in *dicta*.

3  Defendants are incorrect.   Subsequent to Cohen, the Ninth Circuit

4  has expressly recognized a conspiracy claim under § 1983.

5  Gilbrook v. City of Westminster, 177 F.3d 839, 848-52 (9th Cir.

6  1999) (upholding jury verdict finding city mayor, city council

7  members, the assistant city manager, the fire chief and other

8  city officials liable under § 1983 for conspiracy to violate city

9  firefighters' First Amendment rights); see also Mendocino

10 Environmental Center v. Mendocino County, 192 F.3d 1283, 1301

11 (9th Cir. 1999).

12      To establish the defendants' liability for a conspiracy, a

13 plaintiff must demonstrate the existence of "an agreement or

14 meeting of the minds to violate constitutional rights."

15 Mendocino Enivronmental Center, 192 F.3d at 1301 (internal

16 quotations omitted).  Here, for the reasons set forth above,

17 plaintiff has raised triable issues of fact with respect to his

18 First Amendment retaliation claim sufficient to withstand summary

19 judgment on that claim and, correspondingly, on this claim.  As

20 to defendants' alleged "agreement" to violate plaintiff's First

21 Amendment rights, plaintiff proffers evidence that the individual

22 defendants met as part of an ad hoc committee to plan his

23 termination.  (AF ¶s 8, 9.)  Such evidence is sufficient to raise

24 a triable issue as to whether defendants engaged in "some

25 concerted action, intend[ing] to accomplish [the] unlawful

26 objective" of terminating plaintiff for exercising his First

27 Amendment rights.  Mendocino Enivornmental Center, 192 F.3d at

28 1301.  Indeed, whether defendants were involved in an unlawful

conspiracy is generally a factual issue which should be resolved by the jury, "so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached understanding to achieve the conspiracy's objectives." Id. at 1301-02 (internal quotations omitted). Therefore, defendants' motion for summary judgment as to this claim is denied.

### 4. Qualified Immunity

Plaintiff sues the individual defendants in this action in both their official and individual capacities. (Compl., ¶s 3-7.) With respect to plaintiff's claims against them in their individual capacities, the individual defendants move for summary judgment on the basis of qualified immunity.[14] As the court dismisses plaintiff's due process claim against all defendants, it discusses herein only whether the individual defendants are entitled to qualified immunity as to plaintiff's First Amendment retaliation claim.

Public officials are entitled to qualified immunity for acts that do not violate "clearly established . . . constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, when considering a

---

[14] It is not clear from defendants' motion whether they also seek summary judgment on the ground of qualified immunity with respect to plaintiff's claims against them in their *official* capacities. Such relief is clearly not available as qualified immunity applies only to suits against government actors in their individual capacities. Hafer v. Melo, 502 U.S. 21, 25 (1991). Accordingly, the court construes defendants' motion as seeking relief on the ground of qualified immunity only as to plaintiff's claims against the individual defendants in their individual capacities.

defendant's motion for summary judgment on the ground of
qualified immunity, "[t]he threshold question . . . is whether,
taken in the light most favorable to the party asserting injury,
the facts alleged show that the officer's conduct violated a
constitutional right." Bingham v. City of Manhattan Beach, 329
F.3d 723, 729 (9th Cir. 2003), superceded by 341 F.3d 939 (citing
Saucier v. Katz, 533 U.S. 194, 201 (2001)).  If a violation can
be made out, the next step is to determine whether the right
violated or the law governing the official's conduct was clearly
established such that "it would be clear to a reasonable officer
that his conduct was unlawful in the situation he confronted."
Id. (quoting Saucier, 533 U.S. at 202); Act Up!/Portland v.
Bagley, 988 F.2d 868, 871 (9th Cir. 1993).

Where a defendant's conduct violates constitutional rights
and the law is clearly established, the defendant may not claim
qualified immunity.

Here, the threshold inquiry is satisfied because the court
has determined above that a reasonable jury could find that the
individual defendants violated plaintiff's First Amendment
rights.  The next question is whether, at the time of plaintiff's
termination, the law regarding First Amendment retaliation was
clearly established such that a reasonable officer would have
been on notice that such conduct was unlawful. Saucier, 533 U.S.
at 205.

At the time, the law was clearly established that county
officers cannot retaliate against employees for the exercise of
First Amendment rights. Hyland v. Wonder, 117 F.3d 405, 410 (9th

Cir. 1997).

> We have held that as early as 1983 '[i]t could hardly
> be disputed that . . . an individual had a clearly
> established right to be free of intentional retaliation
> by government officials based upon that individual's
> constitutionally protected expression.' [citation
> omitted]  When the individual is a government employee,
> he or she has a right to speak on issues of public
> importance without being fired from public employment.
> [citation omitted]  In <u>Hyland I</u>, we noted that the
> well-established 'right of public employees to speak on
> matters of public concern . . . is an outgrowth of the
> constitutional tenet that public officials may not deny
> or deprive a person of a governmental benefit or
> privilege on a basis that infringes her or his freedom
> of speech.' [citation omitted]

<u>Id.</u>  Thus, given the established state of the law at the time in

question, the individual defendants had "fair warning" that

termination of plaintiff for exercising his First Amendment

rights was unconstitutional.  <u>Hope v. Pelzer</u>, 535 U.S. 730, 741

(2002) (noting that the salient question is whether the law at

the time of the disputed conduct gave the defendant "fair warning

that their alleged treatment of [the plaintiff] was

unconstitutional").

Accordingly, because there are triable issues of fact as to

whether the individual defendants terminated plaintiff for

exercising his First Amendment rights, and because the individual

defendants had fair notice that their alleged conduct was

unconstitutional, the court cannot find, on summary judgment,

that they are entitled to qualified immunity.

**5.   Punitive Damages against EID**

Defendants move to dismiss plaintiff's claim for punitive

damages against EID on the ground that as a municipal corporation

EID is absolutely immune from such damages claims.  <u>City of</u>

1  Newport v. Fact Concerts, 453 U.S. 247, 267 (1981) (finding
2  municipalities immune from punitive damages claims brought under
3  § 1983 as it would be wrong that "retribution should be visited
4  upon the shoulders of blameless and unknowing taxpayers").
5  Plaintiff responds, not challenging the controlling law, but
6  arguing that defendants have failed to proffer evidence that EID
7  *is* a municipal corporation.   However, it is *plaintiff's* burden to
8  produce evidence that EID is not such a corporation, and
9  *plaintiff* has not done so.   Moreover, plaintiff alleges in his
10 complaint that EID is a municipal corporation.  (Compl., filed –
11 [caption names the El Dorado Irrigation District, "a municipal
12 corporation"].)  Under federal law, a party is conclusively bound
13 by the factual allegations in his pleading.   American Title Ins.
14 Co. v. Lancelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988).   As
15 such, plaintiff is bound by his allegations regarding EID's
16 corporate status, and accordingly, either under City of Newport
17 or based on plaintiff's lack of an evidentiary showing, the court
18 grants summary judgment in favor of defendants on this issue.
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED in part and DENIED in part.  The motion is granted with respect to plaintiff's claim for punitive damages against defendant EID.  The motion is also granted with respect to plaintiff's § 1983 claim against all defendants for violation of plaintiff's due process rights.  The motion, however, is denied with respect to plaintiff's § 1983 claim against all defendants for violation of plaintiff's First Amendment rights and conspiracy to violate said rights.

IT IS SO ORDERED.

DATED: December 19, 2006

FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE